The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. All right, please be seated. I'm going to start off with the United States v. Seward and Mr. Kendrick. Good morning, Your Honors. May it please the Court. There are three issues before the panel and obviously I will follow the Court's direction on what you want to discuss, but I'd like to start with the Confrontation Clause violation because I think that is the clearest issue in this appeal and it presents the simplest path for relief for Mr. Seward. That issue is governed by the Supreme Court's opinion last year in Smith v. Arizona, which held that when a substitute analyst witness testifies in court in reliance on the work of an absent analyst is relevant to the case because of its truth or accuracy, then the Confrontation Clause is violated. I think that theory makes perfect sense because what it's trying to do is prohibit a witness who is once removed from the truth we're trying to get to from testifying in such a way that that truth or accuracy is insulated from cross-examination. And that was the heart of what Smith v. Arizona said. Mr. Kendrick, can I ask you, just as a threshold factual question, what specific testimony by this analyst do you contend violated the Confrontation Clause? Because I think the problem is I think some of it is almost certainly fine. So what question and what answer is a violation of the Confrontation Clause? So if I can answer your question in two parts. I think you're right. There are a lot of her testimony is fine. When she testifies about how DNA works, how her lab works, those are all things that don't really implicate the Confrontation Clause at all. And even if she learned them from reading, most of us learn most of the things we know from reading. Absolutely. And I think that that is what the way I would look at it is general testimony. But when she begins to testify about the consistency of the DNA sample that's found at the crime scene and whether or not it's consistent with Mr. Seward's DNA, she is testifying to, and I'm going to call it a match. I think as DNA progresses, and I think as the legal system tries to progress with it, a match is not the right word. Really consistency. But that's more of an improper opinion misleading the jury than a Confrontation Clause. Right. So if I say that, what I mean is consistency. So what she is saying is that there was a match or consistency, if you will, between the sample and the defendant. But she is basing that on work that the absent analyst did. And if you look at the government's exhibit that the panel asked for, so it's not in the joint appendix, but the government, I obviously realize we need to supplement the record, but it's the slide show that the U.S. Attorney put up when they were going through the precursor testimony. There's essentially seven steps that go with DNA analysis. And I think that I wanted to try to avoid getting into the weeds about how DNA works, number one, because it might work against me to try to explain this. I'm not great at it. Well, can I just tee up with you? What strikes me is the difference. I'm not saying it's a controlling difference, but the difference between this case and Smith, and invite your response on that. So imagine that in Smith I understand that the analyst testifies to basically three things. Here is how this normally works. I'll call that step one, right? Step two, here is what someone other than me in this case did in this case, like the things that some other person did. I'll call that step two. And then step three is my conclusion about what my conclusion about what's true here, and that's step three. Do you agree that that's Smith presents that, where someone testifies to one, two, and three? That is Smith. Okay. So one is fine. We all agree that one, totally fine. Concede one. And what strikes me as tricky here, unless I'm misreading the record, the analyst here never expressly testified to two. They just sort of testified to one and then testified to three. I'm not saying that changes the answer, but first of all, do you agree that's factually true here? And I apologize. Tell me again when you said number two, step two. Number two is where you describe what some other human being did. Right. So, well, I think she in some ways did, because when we started cross-examining her and asking her how assumptions were made. Well, no, now you're introducing, I'm talking about her direct test, the analyst's direct testimony. Right. So, but I think she certainly testifies. Here's where I think things got confusing, and I think this is the glaring problem with this case, is that it's sort of framed on appeal and the district court framed it as though she was, had redone the work. In other words, that, but that isn't true. And that's exactly, she says quite the opposite. And I'm willing to grant you that. I'm just willing to, but that she, she jumps, so I guess another way to describe it is, and I'm going to use hearsay at a colloquial way. I don't mean hearsay under the federal rules of evidence. I mean an out-of-court statement that offered to prove the truth of the matter asserted, not including the carve-outs that Rule 801 has. It seems to me here that she didn't repeat the hearsay like the analyst in Smith did, but her testimony is obviously reliant on the hearsay, because absent the hearsay, I don't know how she can say what she says at step three. So that in other words, that Smith is a case in part where the witness says the hearsay, whereas this is a witness, a place in which the witness doesn't say the hearsay, but the entire foundation and premise for their opinion has to be the hearsay, because otherwise I don't know how she draws any conclusions. It has to be, and it's the functional equivalent. And I think it goes back to where, how we understand the working of DNA is that there are a series of judgment calls, and that's not what it looks like on a crime show on TV. And in fact, when Summers from this court back in 2011 described DNA and they talk about raw data generated by a machine, that is just simply not how DNA works. So what's your best, I mean, it seems intuitive to me that you can't just avoid the Smith problem by just omitting step two. But I guess, what is your best authority for the proposition that you can't avoid the confrontation clause by just omitting step two? I mean, Your Honor, I have looked at just about all the cases that have come out after Smith. I was really hoping you found something. No, and I'll be honest with you, just last night, I looked at every circuit's view of Smith, and there's not really anybody that's done it. So, you know, we get to be first, which has some advantages. And I think that one thing that struck me when I was getting ready is a line from a 2016 U.S. Supreme Court case called Mathis that involved the armed career criminal, which gives us all trauma to hear. But they said, a good rule of thumb for reading our decisions is that we mean what we say. The dividing line in these cases is that you don't want the lab director to simply be a parrot, that you want to have the lab director have a degree of independence and the lab director to have looked into the underlying data, to engage with the work product that the lab has produced, and to simply go on the stand as a mouthpiece or a conduit or a parrot is obviously presenting confrontation clause problems. But in this case, the witness seemed to know quite a lot about the particular DNA sample and report. And the testimony on the DNA testing was actually quite detailed as to what the analysts had done. And we overturned this on this basis. We're going to be upsetting a good many convictions where supervisors didn't just parrot and act as a conduit, but took the extra step of engaging with the lab report. And when you look at the testimony here, it's not superficial testimony. She knew one heck of a lot about what transpired and was able to talk about it in detail. And isn't that really what Smith and Summers are aimed at? So I'm going to disagree with your honor, but I understand why it looks like she knew all of those details. And I want to be very clear that I do not think Summers is necessarily good law after Smith. That's a gentle way. I don't know how you can possibly square Summers with Smith. It can't be, your honor. That was a corrupting question. Right. I was being overly polite. No, Summers is no longer good law. So, your honor, what she did was essentially talked about what she was reading out of the report that the absent analysts had done. So there's no question she knew a lot about that report. And I was trying to Let me ask you a question. Yes, ma'am. Because this is a, I think your argument is that there's this issue of discretion that the non-testifying analysts use in going about doing the analysis of the DNA. Yes. So give me an example of what would be discretionary. Because I guess that whatever is discretionary is what you're arguing would need under the Confrontation Clause. That's why you would have to have the non-testifying or the original analysts on the case. Right. That's the critical part. That's what separates it from the raw data. And I wanted to pull, I wanted to go to it so I don't miscite this. But I think that if you look at JA 918 to 922 where she is, we are asking her. And again, this is cross, but the point is she wasn't testify, she didn't testify about how some of these judgment calls were made. So we're asking her about when you are looking at a DNA sample, there are peaks. And some of those peaks are flagged by computer software as a peak when they're actually How long did this jury trial, we got a jury verdict here. How long did this jury trial last? The jury trial lasted six days, if I remember correctly. Six days. So on the basis of this, the government contends harmless error. But on the, you're asking us to overturn the results of a six-day jury trial in which the jury convicted this individual of murder because he was angry that a certain package had not been delivered by a postal worker. Isn't this a case where the jury's verdict deserves a good deal of respect? Even independently, even assuming arguendo, and I don't know that I go with you on that, but I don't understand how that would justify overturning the results of a lengthy jury trial. The bottom line for me is that the district court deserves some respect under the abuse of discretion standard, and the jury verdict deserves some respect based on the totality of what it found. That's the problem. You've got two little hills to climb, and if you manage to climb those two little hills, then you have to get down and grapple with Smith, and it seems tall order. If you'll indulge me, because I'm out of time, Your Honor, this is the most important question, and if I could answer it, I think it's important. So, yes, I am asking you to overturn the results of a six-day jury trial and a jury verdict. But, Your Honor, I am almost always, and anyone who stands up here on appeal is asking to overturn the results of weighty and important proceedings in the district court. There are two ways that you view it. If it is an evidentiary issue, it is often going to be harmless error, and you may not do that. Okay. You've got some rebuttal time, but I'm going to ask, if my co-panelists have any further questions of you, I'll ask you to stay right there. I'm not sure you got a chance to answer Judge Benjamin's question. Could you please do that? Yes. So when the peaks that the computer software flagged, and I may get this backwards, but it's either elevated stutter or artifacts, which is a byproduct of copying DNA. Essentially, the DNA samples are too small for the software to analyze, so they're copied repeatedly in order for the sample to be looked at under a system called StarMix or however there's various programs that do it. There's a series of judgment calls that the analyst makes to determine whether we throw out those peaks, whether we call them something else. Are they elevated stutter? Are they artifacts from the strand slippage? But at the margins, isn't this a discretionary call? I mean, there could be clear cases where there was a confrontation clause violation. There could be, on the other hand, cases where there was no problem at all. At best, this is one of those, this is a marginal case, but it's not a clear cut case for you given the degree of engagement that the witness had with the report. And on those kinds of questions, at this point, doesn't it become judgmental for the trial court? Why don't you answer that on rebuttal, okay? Because you've reserved seven minutes for rebuttal, which is more than most. Thank you. Good morning, Your Honors, and may it please the Court. I'm Nick Bianchi on behalf of the government. In the course of carrying out the murder of Irene Presley, Trevor See were left behind overwhelming evidence of his guilt. The district court correctly admitted all of that evidence, and obviously on the confrontation clause issue that we've been discussing, I would submit to the Court that she was not a conduit, a parrot for the missing analyst. So your position is that the missing analyst did not have to use any discretion in the testing of the DNA as to how, and I can't get into the specifics of it, but what he was, I think, attempting to. In terms of the judgment calls of stutter and all that sort of thing? Yes. Now, I would submit, yes, the analyst did make those calls, the initial analyst, but I would say Dr. DeWin also, it's clear from the record in what she told the jury that she does, made the same calls herself, and I can point to parts in the joint appendix where she discusses what she does, because in Smith, they brought in an analyst that had nothing to do with the original testing, who just looked at her reports, and his name was Longione, the original analyst was Rast, and Smith, he took her notes on the stand, referred to them, related what was in them, and what we have here with Dr. DeWin, who was the one who had to sign off on the initial results in this case, she testified, among other things, quote, what I do is evaluate all of the work that has been conducted to ensure that the results that the analyst comes up with is consistent with the work that's performed and what the data says as well. She went on to testify, I also review the controls and the original data itself to ensure that the calls the analyst is making are accurate. Again, she said, I'm verifying all of the DNA profiles to ensure that I would reach the same conclusion, and while she didn't do it here, she explained, no, she did that here. Okay, okay, okay. I'll just finish in a sentence. Okay, okay. I was like, you're about to tell me something she didn't do. No, no, no. What she didn't do in this case, but she testified that she will do if necessary, is when she's doing this review like she did here, if she disagrees with something, she'll kick it back and say, hey, take a closer look at this. Again, showing that she's doing her own. Is she doing this as, is she supervising the analyst, or is she doing this as reviewing the notes? She's the supervisor. So, again, she. I understand, but in her role as a supervisor, is she supervising the analyst doing the work? Or is she just reviewing, what she's testifying to sounds like her reviewing the notes and saying I would do it the same way. No, I believe the analyst is doing, making their calls, looking at the, looking at what the machine puts out, making a call, and then we submit that the record shows that Dr. Nguyen is the supervisor, is looking at everything fresh herself, and then seeing what the calls are made. Okay, so at some point, this is about how you read the analyst's testimony, but for purposes of this question, I want you to assume that I read the testimony this way, and then invite you to tell me if I read the testimony this way, what are the implications, rather than fight with me about whether this is what the testimony says. So I read the testimony as saying that she could only compare the profile produced by the lab, that the only reason she could do any of the things that she herself did, and I agree, she said she did some things herself, but I read her as saying she could only do those things because she accepted as true the analysis had, the analyst had performed proper extraction and used appropriate methods to create the DNA profile in the first place. That there's no way that I read the supervisor saying I can't even do the things I do, unless I assume that the way they extracted it was correct, and the way they created the other methods to create the profile were correct. If I read it that way, why isn't that a confrontation clause problem? Because she is relying on someone else's statements that they did certain things in a certain way. I think if you read it that way, then I think you're right. There is a confrontation clause issue that then we look at further analysis.  Maybe not that's the answer, but that that creates a confrontation clause issue. Right. I think that gets us into the end around that Smith talked about. Okay. And then can I move you to Summers? How in the world has Summers not been abrogated by Smith? That seems wildly inconsistent with Smith. I don't necessarily disagree there. I think Smith is Because I read Summers as saying as long as the person at the back end does some of their own work, they're allowed to relate statements from the earlier person, and that seems to me categorically inconsistent with Smith. I think some of their own work is inadequate. But if it's a completely independent review Like they said, given the predominance of the independent I'm reading from Summers, just to be clear. I'm reading that in Summers, the key analytical move this court made was to say because the person later did independent subjective opinion and judgment, there's no confrontation clause problem. I don't see how that survives Smith. No. I understand that, and I certainly appreciate that. And I think what I understand the appellant's argument to be in terms of, you know, the DNA analysis and where it become, you know, how much the testifying witness had to rely on the initial analyst to reach her conclusions. I think the point that Mr. Kendrick was making both at trial and today is he's focused on the judgment calls that have to be made in coming up with a conclusion. The whole question of the degree of involvement of the supervisor, it's a matter of degree. To what degree was the supervisor involved in questioning the conclusions in making independent judgments? To what degree did the supervisor familiarize herself with the details of the report? And isn't that question of degree under the Smith decision a discretionary question for a district court in supervising testimony? Yes, I agree, because Smith doesn't say you can never, you always have to bring in the person that did the first analysis. And I'd point to, again, I've said some quotes earlier from Dr. Nguyen's testimony, but Joint Appendix 908, I'd also say where she says, quote, I also review all of the positive and negative controls conducted during the laboratory process. And I think this is key. And then I independently review the conclusions to ensure that I come up. Isn't the Smith test of independence, doesn't it set this up as a matter of degree? I believe so. Okay, and if it is a matter of degree, that would be in the course of an evidentiary ruling where the district court is doing the trial. A matter of degree has to be a matter of discretion. And surely, you know, you can say under the abuse of discretion standard, well, I might have ruled differently. But that's not the question. The question ultimately of wasn't there enough independent review of the report as to move this into a judgment call? And doesn't Smith indicate that and lay the groundwork for that? Yes, Your Honor. And, of course, with the Confrontation Clause issue, we're reviewing de novo, not for abuse of discretion. But I think even then, again, as I was, so it's a matter of do you find, well, one, we've got Judge Coggins' ruling, JA 890, where he says that she engaged, finds that she independently engaged in reviewer analytical process. But that's just Summers. And that's just the thing you said was abrogated by Smith. Right. I don't care that she did her independent review. The question is whether she impermissibly relied on some statements of Summers. Or she didn't do. That's correct. And this was all pre-Smith. But, and again, obviously that's where we have a difference here on both sides as to whether she did enough. Our opinion is that it's clear when she talks about independently reviewing conclusions to ensure she would come up with the same results, that she reviews the controls in the original data itself to ensure that the calls the analyst's making are accurate. You know, we're having, I understand your point. It's a good one to make. This is a serious matter here. We're talking about a murder of a postal worker because of anger over not delivering a package in the way some postal service patron or customer wants it delivered. But we're talking about a six-day jury trial and we're talking about a case of murder under the thinnest of pretexts. There's no reason for what happened to that postal worker here. It was killed for no reason. And we're talking about a jury verdict where 12 conscientious citizens rendered judgment after six days. Now, what impact did this one piece of testimony have upon the totality of the trial and the evidence? And I gather with this particular testimony, it was subject to cross-examination, was it not? It was, absolutely. And if there was one of these, some of these confrontation clause problems can be resolved through cross-examination and they may go, the district court might say as a matter of discretion, this goes to the weight of the testimony and not to its admissibility. And if a defense counsel feels that the lawyer or that the supervisor is acting as a parrot, that you can expose the lack of depth in the supervisor's role through cross-examination itself. In other words, the confrontation clause opportunity helps to mitigate any problems on the confrontation business because you can say, look, this report, you don't know anything about it, but that's not what happened here. She knew a lot about it. She knew a lot about it. That's correct, Your Honor. But in the totality of this trial, reading it through, it's just hard for me to think that the whole thing turned on this question. Given what she knew, given the opportunity for cross-examination, given the gravity of what was done and the evidence that was accumulated as to what was done, did this trial turn on this little point? I don't believe so, Your Honor. And I think, so obviously the point of this testimony and the conclusion that was reached that was damning to the appellant is that his DNA was on the inside of the driver's door. Now, what's not contested here today . . . The bloody handprint? The bloody handprint, his handprint and palm print on the outside of her car. An individual that the appellant knew, seeing him driving at a high rate, driving Ms. Presley's car from the murder scene to where she was left, and then we could go through everything else. But so I agree that with Your Honor, Judge Wilkinson, that I don't think it had such an impact that the case, that he otherwise would not have been convicted but for that testimony. Can I ask you this? So you heard me ask your colleague about the step one, step two, step three, and that in this case I read the analyst as not testifying to step two. Right. But I guess one way to think about this for me as an evidentiary matter which intersects with the Sixth Amendment is, so when the witness says, they say, what is your conclusion about what happened here, right? If defense counsel had said, objection, lack of foundation, at the moment where the supervisor is asked, what is your conclusion? And then the witness, the counsel says, lack of foundation, based on her testimony so far I have no idea what that conclusion would be based on because she hasn't explained how she knows anything about the facts of this specific case. The answer would have been, I relied on statements that someone else made to me, right? I don't think so. How do you know that the test results you reviewed were actually the sample taken from the crime scene? Someone else told me. How do you know that this DNA profile was created correctly? Someone else told me, right? Or I read some statement in which someone else said that. Well, and I think the original analyst, because, again, their issue was with the judgment calls that were made with stutters and alleles. That's what they tried to focus on in cross-examination of Dr. Nguyen. But that's not their job. But they objected to this testimony, right? Right. They're not limited to the grounds on which they crossed the witnesses on after the testimony was allowed in. That's correct, Your Honor. But I think, you know, the DNA is coming from this. So, sorry, can I go back? Yes. What would the supervisor have testified if asked as a prelude to being allowed to give this opinion, how do you know these things about the specific facts of this case? What would she have testified to? I believe that the answer that she would have given would have been the same one that Ms. Mcheechan would have given if she had been there in terms of this is how we learned, because she did review the whole case file. How do you know that's the case file for this case? Because, again, I'd have to look back when she got into the specifics of this case. But she testified as to what she does as a supervisor. I guess let me take a step back. Is the government's view that you can evade Smith by just omitting Step 2? No. We just don't believe that she omitted Step 2. Okay. But that's important, right? So it's not the position of the government that as long as the person never actually says every conclusion I'm about to give you is based on inadmissible hearsay, you can avoid the problem. I mean, look, under the rules of evidence, you probably can do that under Rule 702. But I don't think the Confrontation Clause lets you do that. Yeah. No. This was — I agree with Your Honor. This was not an end-around or trying to be cute or anything like that. We felt that she had a sufficient independent basis for all of her knowledge, and we think the record shows that. And I think, to be clear, the only — the government's position is the only possible statements that may even get to a Confrontation Clause issue are the ones brought up earlier that were questions on cross where she was asked specifically about judgment calls that someone else made. So she answered those questions directly about what someone else was — Well, I mean, by asking those questions on cross, he probably waived any Confrontation Clause objection to what she was going to say in response to his cross-examination. And that's what I would submit. So given that, we do not believe that her testimony creates any Confrontation Clause issues and is not — even with Smith coming post-guilty verdict, we don't believe Smith does anything to change the decision made by the district court in this specific case. Let me ask you a question and follow up to Judge Wilkinson's question. So let's say, for whatever reason, we think that you have a Smith Confrontation Clause issue, and Judge Wilkinson asked you earlier about the — I guess the abundance of other evidence. Do you think it — does it matter at all? I know the lower court made some comment regarding this case being strictly circumstantial evidence. Do you think that affects your argument on the — your harmless argument? No, because, as Your Honor knows, circumstantial evidence is just as good as direct evidence, and the jury's instructed on that. And so, no, was there an eyewitness to the actual murder? No. But when you have everything else and the timeline that was presented to the jury in terms of his movements that day, what puts him in certain places, even though it's circumstantial — Even excluding the DNA, you feel as if the government's evidence was still — Yes, Your Honor. And I'm happy to tick through everything. Well, can I go back? So now it's striking me that, to the extent you and I are having a conversation, it's literally about what she testified to. So I asked someone, and someone has provided me. This is page 908 of the JA. This is what I understand the analysts who have testified to. As a technical reviewer, I reviewed the chain of custody. I verified the notes against the chain of custody. I also reviewed the description of the evidence items and the item numbers that match up to the DNA results. That's the testimony of the supervisor. In other words, she's saying, I read some things that someone else wrote, and I used those as the basis, in part, for my conclusion. Is that not what she's saying there? I think she is saying that she did all of that. Why isn't that a Confrontation Clause problem? She's saying, I listened to what someone else said they did and what they found. I relied on that informing the opinion that I'm about to give you. Because I don't think that's what she relied. She's saying she did those things, but I don't think she's going as far as saying, I relied on that. I think a few sentences or a sentence later, when she says, I also review all of the positive and negative controls conducted during the laboratory process. How does that make it better, not worse? She's saying, I relied on some other things that the person who's not me also did. Well, because I think laboratory controls we're talking about, I think then you're getting into what the machine's doing. Okay. Take your point. The machine is not a Confrontation Clause problem.  Fair enough. And so, and then I independently review conclusions, meaning to ensure that I come up with the same conclusions as the analyst. I think there's no other way for her to do that than to do her own analysis, if you will, and then see does it match the initial analyst. So, yes, of course she's going to review what the initial analyst did. But in terms of what she decides the ultimate conclusion is, it's based on her own independent work. In these instances, it seems to me that you make an interesting point, and that is that invariably the supervisor, if they go on the stand, they're always going to agree with the individual whose report they are supportive of, because otherwise they wouldn't go on the stand at all. So there's always going to be a degree of agreement. But the degree of agreement doesn't, that's not the test. That doesn't, the fact that there's an agreement doesn't mean that there's a Confrontation Clause violation. The question is, what is the basis for the agreement? And as to that point, the defendant rightly is afforded full scope of cross-examination. And you say, well, what basis do you have for doing that? Have you looked at the, have you actually looked at the report? Did you do this? Did you do that? You can vigorously cross-examine that report, and if the supervisor doesn't have persuasive answers, it's going to reflect very negatively in the jury's mind. And so what I'm saying here is that a Confrontation Clause violation, and I wouldn't concede for a minute that this is a clear Confrontation Clause violation. I think it's a discretionary matter, and as to the admission of evidence as a discretionary matter, that is always subject to cross-examination itself. And the cross-examination can act as a mitigating factor for any marginal issue over the Confrontation Clause. Do you see what I'm saying? Yes, Your Honor, and I know I'm over time. Because there is confrontation here. There is confrontation. Oh, they say it's a Confrontation Clause violation. Well, wait a minute. There's vigorous cross-examination, and it's hard to say, well, there's a real huge Confrontation Clause violation when she's subject to confrontation in the most direct sense. Yes, Your Honor, I agree. And as I said earlier, Smith does not say you always have to have the original analyst come in and testify when you're getting into lab results of any sort. And again, I'm over time. I won't. That's fine. But let me ask my friends if they have any questions. Toby. One quick one. Just to be clear, it's not your position that it's okay that you can't cross-examine X because you were able to cross-examine Y, right? Like, it's okay that you can't cross-examine person X. There is no principle of Confrontation Clause that says so long as the government is able to cross-examine Y here at the supervisor, it's not a problem that you couldn't cross-examine X. That's correct. Okay. And so, again, because we're over time, I won't. I think our brief lays out all the other evidence that would lead to a harmless error analysis, and we'd ask that the Court affirm the appellate's conviction. My last thing is that if there was no opportunity to cross-examination or if it was curtailed arbitrarily or whatever, that it would have compounded any problem. That's correct. And they made the choice to. That's all I'm saying. I'm not saying that invariably what, you know, the opportunity to cross-examination cures any particular clause. That's not your position. Judge Huygens is absolutely correct about that. But it's a factor. It's a factor. I mean, it happened. It's a mitigating factor.  They made the choice to cross-examine Dr. Nguyen about someone else's decisions, knowing that Dr. Nguyen was going to be the one there as opposed to that witness. So, again, we'd ask that this Court affirm the appellate's conviction. Thank you. All right, sir, you've got some rebuttal time. Mr. Kander, can you start with harmless error? What about the bloody handprint? Right, I know. And, listen, Kander to the Court, that's the problem. I get it. I understand the evidence, and I understand that that was pretty important and powerful evidence. But this is not an evidentiary ruling that I am arguing about. In Smith v. Arizona, six months ago the United States Supreme Court told us, this is a confrontation clause error to which there are not degrees. It is or it is not. It is from the exact same amendment that gives us that jury trial we're talking about. It is not subservient to anything in that amendment. It is important. And what happens when we look at this, we go to, and I don't think these are cited in the brief, but Chapman v. California and Fahey v. Connecticut are some 1960s Supreme Court cases talking about constitutional violations and harmless error. And this Court has cited those opinions. I think the one I found most recently was in Corbello, which is 343 Federal 3rd at 278. But we ponder everything, and is there a reasonable probability that the evidence complained of might have contributed to the conviction? This is not abuse of discretion. We do not give the district court a pass for making a judgment call. We look at this violation, and this is a confrontation clause violation under Smith v. Arizona. It is, when we were talking about the line of questions that were asked in Smith v. Arizona, if you look under the U.S. Reporter at around page 797, they excerpt the trial from the Smith v. Arizona case. And they put the cross, or the series of questions in there that they have a problem with. And then if you go to 907, 908, and 909 in RJA, they're slightly more detailed, but the exact same theory. It is all these things I have done that are just part of the checklist. And I struggle, because science, obviously, is why I became a lawyer instead of a scientist. But I was trying to think of a good analogy, and I think about checking someone's math. And I think about maybe in the accounting world, if two numbers add up to the correct number, that is what she was technically reviewing. What she was not doing was creating those numbers. And that is why this is critical. And I wasn't being flippant when I cited Mathis, but the Supreme Court said in that case, we mean these things when we say them. My concern, if we start getting hung up in not properly evaluating the Confrontation Clause violation. This is so far removed from the Fountainhead case, which was Crawford, where the Confrontation Clause was because the individual testifying really had no engagement or independent review of what they were testifying about. But the facts here, and the evidence, the detail of the testimony, and the evidence of independent review of the data, just seems to me a long ways away from the Crawford case and what it was originally concerned about. We would have traveled a good distance to say that something like this was a Confrontation Clause violation. Well, but Your Honor, we didn't go from Crawford to Smith. There were waypoints along that journey in Bullcoming and Melendez-Diaz where the Supreme Court is clearly evolving Crawford to apply to what we see more and more of in trial work, which is scientific evidence. It just feels to me like ever since Melendez-Diaz, the Supreme Court is like Crawford is not applicable to experts. And over and over and over and over again, the government is like we came up with a new argument for why Crawford isn't applicable to this expert. And over and over again, the Supreme Court says no, Crawford is also applicable to this expert. And they told us the answer to this case in Smith v. Arizona, and they addressed the vast majority of the concerns that we've discussed this morning when they said this is not an evidentiary issue. State and Federal rules of evidence will in no way override the United States Constitution. So even when we get into like the degree of involvement in the judgment calls what Smith v. Arizona said, if you didn't do the work and the truth of that work matters. The point is you can't assume that somebody just by virtue of holding a position as a supervisor is thereby rendered ignorant of what it is that they are supervising. I mean, it seems to me you're making a jump that just by virtue of being a supervisor, that presupposes ignorance. And it doesn't. True, the supervisor didn't perform the DNA test herself, but there are supervisors, and then there are supervisors. And some supervisors just sort of wave a wand over it and accept whatever the subordinate does. But there are other supervisors who are hands-on and who get into it. And I've run across both kinds. But there are some supervisors that are pretty challenging to deal with because they go into detail. They ask questions. They're vigorous in every way. And this seems to be one of those. It seems to be the involved kind of supervisor over the kind of supervisor that just says, oh, yeah, it's fine. No problem. I grant you there are supervisors that just wave a wand over it and just rubber stamp it. But that's not the universe of supervisors. There are a lot of supervisors that will ask you question after question after question after question. And that's part of why the district court has to have some leeway on something like this because you want to find out what sort of supervisor it was. But I don't render them ignorant of the results. The U.S. Supreme Court renders them incompetent to testify about that because she was not hands-on with this evidence. And that is a reframing of her testimony, that she clearly told the district court she did not redo this analysis. She wasn't involved in it. All right. I'll stand on my brief for the other issues. I want to say that you're court-appointed, and I want to thank you very much for your argument. And I really appreciate the vigor with which you've approached the case. But before you sit down, I never want to cut off a wonderful Judge Hyten's question. I have no questions. Thank you.
judges: J. Harvie Wilkinson III, Toby J. Heytens, DeAndrea Gist Benjamin